PINE PRODUCTS CORPORATION,
Timber Investors, Inc., and Joint
Venture, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 529–88 C.

United States Claims Court.

March 12, 1990.

John B. Crowell, Jr., Portland, Or., for plaintiffs. Spears, Lubersky, Bledsoe, Anderson, Young & Hilliard, Portland, Or., of counsel.

Richard P. Nockett, with whom were Asst. Director Thomas W. Petersen, Director David M. Cohen, and Acting Asst. Atty. Gen. Stuart E. Schiffer, Washington, D.C., for defendant. Rhea Daniels Moore, Dept. of Agriculture, Washington, D.C., of counsel.

## OPINION

WIESE, Judge.

### I

This case presents a question of statutory interpretation that focuses on (i) the definition of the term "affiliates" as given in the Federal Timber Contract Payment Modification Act ("the Act"), 16 U.S.C. § 618(a)(7)(B) (1988) and (ii) its application in determining the timber "buy-out" entitlement of a joint-venture purchaser.

The identical issue was presented in *Pine Products v. United States,* 15 Cl.Ct. 11 (1988). Although that suit was dismissed because of Pine Products' failure to have joined an indispensable party, nevertheless we did discuss the merits (only, of course, as an advisory ruling) and decided in the Government's favor. In the present suit, Pine Products has been joined by its joint venture partner, Timber Investors, Inc. and thus all parties necessary to a complete adjudication of the issue are before the court. Hence, this time around we can speak to the merits with finality.

As before, the case is submitted to the court on cross-motions for summary judgment and, as before, we hold for the Government.[1] Although the opinion that follows repeats much of the earlier ruling, there are some changes in text of sufficient importance to warrant our restatement of the matter in full.

### II

The Federal Timber Contract Payment Modification Act, 16 U.S.C. § 618 (1988), permits holders of certain contracts for the purchase and logging of federal timber to be released from a portion of their contract obligation upon payment to the Government of a buy-out charge. In 1985, Pine Products Corporation, one of the plaintiffs here, was a 50–percent participant in a joint venture that was granted relief under the terms of the Act. In the present action, Pine Products seeks a partial refund of the buy-out charge that the joint venture paid to the Government, the contention being that the charge was incorrectly determined due to an erroneous interpretation of the Act.[2] Defendant denies this assertion.

### *The Act*

During the 1970's, accelerating inflation, predictions of high demand for housing and fears of future shortages in the Nation's timber supply influenced many companies to contract for the purchase of federally-owned timber at prices well above appraised market values. Beginning in late 1981, however, the advent of sharply higher interest rates and reduced inflation led to a significant downturn in lumber prices. As a result, logging companies holding

---

1. The case was reargued on February 1, 1990.

2. Although the refund claim we deal with here is nominally that of the joint venture, the underlying interest at stake is identifiable to Pine Products' share in the joint venture. Hence, for clarity, we use "Pine Products" in lieu of "plaintiffs."

high-priced contracts for the cutting of Government-owned timber faced the prospect of incurring substantial losses.

Congress, fearing permanent adverse consequences for these companies, their workers and timber-dependent communities, responded by proposing the Timber Contract Payment Modification Act. In the cautioning words of Senator Mark Hatfield of Oregon, one of the principal sponsors of the relief legislation, rigid insistence by the Government on enforcement of its timber contracts would have "devastating impacts." 130 Cong.Rec. 26,981 (1984).

The Act, which was signed into law on October 16, 1984, allowed purchasers of qualifying federal timber sale contracts (*i.e.,* contracts bid prior to January 1, 1982 and held as of June 1, 1984) to buy out up to fifty-five percent of the contract timber volume then remaining to be cut, with any one purchaser being limited to a maximum allowable buy-out of 200 million board feet. 16 U.S.C. § 618(a)(2)(B). A purchaser's buy-out charge would be determined by comparing the potential losses on all its timber sale contracts with its net book worth.

The statute established a three-tiered payment schedule. First, for companies whose potential losses were calculated to exceed 100 percent of net worth, the buy-out charge was a flat rate—$10 per MBF.[3] *Id.* § 618(a)(3)(A)(i). Next, for companies whose expected losses fell between 50 percent and 100 percent of net worth, the buy-out fee was set at 10 percent of the contract overbid[4] but not less than $10 per MBF. *Id.* § 618(a)(3)(A)(iii). And finally, for companies whose projected losses came to 50 percent or less of net worth, the buy-out rate amounted to 15 percent of the contract overbid or at least $10 per MBF. *Id.* § 618(a)(3)(A)(iii). The highest buy-out rate (*i.e.,* 15% of contract overbid) also applied in the case of a purchaser who elected not to provide net worth information to the Government. *Id.* § 618(a)(3)(D).

For purposes of calculating net worth as well as determining the limitation on the volume of timber to be bought out, the Act mandated that affiliated companies be treated as a single entity. *Id.* § 618(a)(7)(A).

*The Joint Venture*

Pine Products Corporation is an Oregon corporation engaged in the manufacture of forest products. In 1980, Pine Products entered into a joint venture agreement with another forest products company, Timber Investors, Inc. The purpose of the Pine Products/Timber Investors Joint Venture ("joint venture") was to bid upon and, if awarded, to operate the Fawn Spring Timber Sale Contract—a multi-year logging contract involving the harvesting of an estimated 20.6 million board feet of ponderosa pine and Douglas fir from the Ochoco National Forest that had been offered for sale by the United States Forest Service.

The joint venture agreement contemplated equal participation between the two partners (the co-venturers) in the operation of their common enterprise. Thus, the two companies agreed to contribute equally to the capital necessary for the purchase of the Fawn Spring timber and to share equally all obligations, burdens and benefits arising from award of the contract.

On July 17, 1980, the Fawn Spring contract was awarded to the Pine Products/Timber Investors Joint Venture. In September of 1985, following the decline in timber values, the joint venture applied for buy-out of the remaining uncut volume on its Fawn Spring contract. At the same time, Pine Products and Timber Investors also submitted applications to buy out of individual commitments which each had entered into under other Forest Service contracts.

Upon receipt of these applications, the Forest Service advised the parties that, in addition to listing the timber volumes for

---

3. "MBF" is an acronym for a unit of timber measurement meaning thousand board feet.

4. The term "contract overbid" is the "difference between the advertised contract rate and the rate the purchaser bid." 16 U.S.C. § 618(a)(3)(F).

which they had individually contracted, each would also be required to list those contract volumes whose ownership or control they shared through an affiliate. In other words, for purposes of measuring individual buy-out volume entitlements, each co-venturer was to report its individually held contract volumes as well as its proportionate share of the joint venture's contract volume.

New applications were submitted in conformance with these instructions. Also, as part of these revised submissions for contract buy-out, Pine Products and the joint venture each furnished information showing their net book worth. Timber Investors, however, did not provide such information.

The Forest Service acted on these applications in October of 1985. Pine Products was authorized a buy-out of some 40.4 million board feet, a volume limitation that took into account one-half of the joint venture's uncut timber. Since Pine Products' potential contract losses exceeded its net worth, it qualified for the minimum buy-out charge of $10 per MBF. 16 U.S.C. § 618(a)(3)(A)(i).

With regard to the joint venture's application—which is the matter of concern here—the Forest Service concluded that Pine Products and Timber Investors were affiliates of the joint venture and that, for purposes of fixing the applicable buy-out rate and net worth figures, the three companies were to be viewed as a single entity. Based on this conclusion and the fact that Timber Investors had failed to provide net worth information, the Forest Service assessed a buy-out charge of 15 percent of the contract overbid—the rate which is statutorily prescribed in those instances where complete net worth data is not disclosed by the purchaser's buy-out application. 16 U.S.C. § 618(a)(3)(D).

On December 9, 1985, Pine Products filed an administrative appeal on its own behalf challenging both branches of the Forest Service's decision—the determination that Pine Products and Timber Investors were affiliates of the joint venture and the determination deeming them to be a single entity for net worth calculation purposes. Pine Products contended that each of these determinations had gone beyond the letter of the statute and had resulted in the imposition of an excessive buy-out rate. As Pine Products saw it, one-half of the joint venture's eligible buy-out volume should have been assessed at $10 MBF, the minimum rate which applied to Pine Products' separately held contracts.[5]

The Chief of the Forest Service denied the appeal and affirmed the decision issued by the Regional Forester.[6] A suit challenging the administrative decision was filed here on February 2, 1987. Following dismissal of that suit for failure to join an indispensable party, a new complaint was filed in the Claims Court on September 7, 1988.

### III

■ As it did in the proceedings below, Pine Products here attacks the Forest Service's decision for what it contends was a compound error in the interpretation of the Act. It maintains, for reasons we take up shortly, that neither Pine Products nor Timber Investors can properly be regarded as affiliates of the joint venture. Additionally, it contends that the Forest Service erred in concluding that the three separate businesses—Pine Products, Timber Investors and the joint venture—together constituted a single entity for purposes of determining the buy-out charge.

The dispute focuses upon subsections (A) & (B) of 16 U.S.C. § 618(a)(7) which provide as follows:

---

5. The total buy-out charge paid by the joint venture was *$383,358.15*. This payment was $128,839 more than would have been due had one-half the volume been assessed at $10 MBF. Thus, it is this $128,839 to which Pine Products claims entitlement.

6. Because the Secretary of Agriculture did not exercise his discretionary review, the Chief's determination became the final administrative decision of the Department of Agriculture. 36 C.F.R. 211.18(f)(2)–(6) (1985).

(A) For purposes only of determining a purchaser's buy-out limitation under paragraph (2) and net worth in connection with buy-out cost under paragraph (3), concerns which are affiliates as defined under subparagraph (B) of the paragraph shall be treated as a single entity.

(B) Definition of affiliates: Concerns are affiliates of each other when either directly or indirectly, one concern controls or has the power to control the other, or a third party or parties controls or has the power to control both. In determining whether or not affiliation exists, consideration shall be given to all appropriate factors, including, but not limited to, common ownership, common management, and contractual relationships.

In applying the statute to the joint venture's request for buy-out, the Forest Service looked first to the definition of affiliates. Among other points, the agency concluded that "control" within the meaning of the Act "may be affirmative or negative and it is immaterial whether it is exercised so long as the power to control exists." Indicia of control, the agency further observed, include "common ownership, common management, and contractual relationships.

Based on this reasoning, and lacking any evidence demonstrating a contrary allocation of power between them, the agency concluded that "each participant in the Joint Venture has the power to control the Joint Venture." Thus, in accordance with the statute's directive (§ 618(a)(7)(B)), each participant was deemed to be an affiliate of the joint venture. And affiliates, as the statute further specified (§ 618(a)(7)(A)), "shall be treated as a single entity" for purposes of determining a purchaser's buy-out limitation and net worth.

Now to the arguments. To start with, Pine Products reads the text of § 618(a)(7)(A) to say that a finding of affiliation is permissible only in those situations where control is exercised by a *single* business entity. The argument comes directly from that part of the statute which refers to concerns being affiliates of each other

when "*one* concern controls or has the power to control the other." (Emphasis added.) Pine Products takes the reference to "one concern" to mean *only* "one concern." According to Pine Products' view then, the language of the statute on its face does not permit a finding of affiliation when, as here, control is exercised by two firms acting together.

We do not accept this reading of the statute; nor do we accept the argument that control in a 50–50 joint venture always involves a shared exercise of power. As to the first point, the statute identifies control in terms of one concern having the power to direct the affairs of another: "Concerns are affiliates of each other when either directly or indirectly one concern controls or has the power to control the other." Nothing in these words demands that control be exercised exclusively by one concern. Granted, that may be the usual case. However, control can, in fact, be located in two firms simultaneously as would be true, for example, in a 50–50 joint venture. In such a situation—and this brings us to our second point—control can be exercised jointly (as Pine Products asserts) and it can also be exercised individually by one of the joint venturers refusing to support a proposed course of action. Clearly, in this latter situation the requirement of the statute is satisfied, for withholding approval is as much an exercise of control over the affairs of the joint venture as affirmatively directing those affairs.

■ Pine Products disputes the point saying that "[t]here is no reality to 'negative control'" and that the ability of one owner to block action by the other is not control of the joint venture within the meaning of the statute. We cannot accept this view. In everyday usage, control is seen both as a negative force as well as a positive one ("To exercise *restraint* or direction...." III *The Oxford English Dictionary* 853 (2d ed.1989) (emphasis added)) and we are offered no reason to assume that this ordinary meaning was not meant to be controlling. *See Banks v. Chicago Grain Trimmers Ass'n*, 390 U.S. 459, 465, 88 S.Ct. 1140, 1144, 20 L.Ed.2d 30 (1968)

("In the absence of persuasive reasons to the contrary," a court should "attribute to the words of a statute their ordinary meaning").

Virtually the same issue we address here came before the district court in *Mt. Adams Veneer Co. v. Lyng*, No. 87–108 FR, 1987 WL 46898 (D.Or. Nov. 9, 1987). That court upheld the Forest Service's position that "control" for purposes of Section 618 embraced negative as well as affirmative exercises of power.

In affirming this construction of the statute, the court noted that the Forest Service had taken its definition from the Small Business Administration's regulations, and, further, that adoption of that agency's regulations was expressly sanctioned in the Act's legislative history. Thus, the court concluded: "in light of the legislative history of the Act, this interpretation is a permissible one." *Id.* at 8.

The decision was affirmed on appeal. In an unpublished opinion of November 15, 1989 (*Mt. Adams Veneer Co. v. United States*, 889 F.2d 1095), the Ninth Circuit ruled that resort to legislative history as a guide in the interpretation of the Act was permissible given the ambiguity inherent in the word control. And, when examined in light of that history, the court of appeals concluded that the Secretary's interpretation was a reasonable one.[7]

Given the language of the Act and its legislative history, we see no basis upon which to question the Forest Service's definition of control. Accordingly, we reject the contention that the term "affiliates," as used in 16 U.S.C. § 618(a)(7)(B), is limited to situations in which a single concern exercises affirmative control over another.

■ Pine Products contends, however—and this brings us to the second argument—that even if it is correct to consider each of the co-venturers an affiliate of the joint venture, it is not correct to consider all three as comprising a single entity. The premise of the argument is that "single entity" within the meaning of 16 U.S.C. § 618(a)(7)(A) is confined by the statute to "concerns which are affiliates as defined under paragraph (B)." Thus—the argument continues—if Pine Products and the joint venture are affiliates, they must constitute a single entity; similarly, in the case of Timber Investors and the joint venture—as affiliates, they too comprise a single entity. The practical effect of this view is to separate a single entity, *i.e.*, the joint venture, into two parts.

Therein lies the problem with the argument. The construction advocated by Pine Products ignores the fact that, under the terms of the statute, it is "a purchaser" who stands as the point of reference for identifying the concerns whose affiliations shall constitute the "single entity," not the affiliated firms themselves. Consider the words: "For purposes of determining a purchaser's buy-out limitation ... and net worth ... concerns which are affiliates ... shall be treated as a single entity." Clearly, the organizing element of the statute is the purchaser, and affiliation must be determined from that standpoint. Pine Products' argument succeeds grammatically only because it ignores this point. Since the joint venture is an affiliate of Pine Products as well as an affiliate of Timber Investors it follows that, from the purchaser's standpoint, the three must be viewed as a single entity.

Not only does a plain reading of the statute require the rejection of Pine Products' argument, but so too does its legislative history. The Senate report which accompanied the Act's enactment (previously referred to in footnote 6) explains:

---

7. The legislative history referred to by the district court and the court of appeals is Senate Report No. 98–596. That report states as follows:

The definition of affiliates contained in subparagraph (7)(B) is adapted from the Small Business Administration's definition of affiliates, contained at 13 CFR § 121.3–2(a). This regulation contains a number of further definitions and examples to which the secretaries [of the Departments of Agriculture and Interior] should look for guidance in determining affiliation for purposes of this legislation.

S.Rep. No. 98–596, 98th Cong. 2d Sess. 4, 12, *reprinted in* 1984 U.S.Code Cong. & Ad News 3796, 3805.

The purpose of this provision [16 U.S.C. § 618(a)(7)(A)] is to assure that companies which buy timber under several names do not receive separate buy-out allocations for each purchasing entity, and to assure that a company's buy-out cost is not inequitably low simply because purchases are made in the name of one entity while the bulk of the net worth is retained under the name of another entity.

S.Rep. at 12, 1984 U.S.Code Cong. & Ad. News at 3805.

Plainly, the construction which Pine Products urges would thwart the very purpose that Congress meant to accomplish: to require affiliated purchasers to be treated as a unit to avoid the manipulation of buy-out charges.

### IV

For the reasons stated, defendant's cross-motion for summary judgment is granted and plaintiffs' motion for summary judgment is denied. Judgment shall be entered accordingly.