**PINE PRODUCTS CORPORATION, Timber Investors, Inc. and Joint Venture, Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee.**

**No. 90–5093.**

United States Court of Appeals, Federal Circuit.

Sept. 30, 1991.

John B. Crowell, Jr., Lane Powell Spears Lubersky, Portland, Or., argued for plaintiffs-appellants.

Richard P. Nockett, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellee, Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director (Rhea Daniels Moore, Deputy Asst. Gen. Counsel, Dept. of Agriculture, of counsel), on brief.

Before NIES, Chief Judge, and NEWMAN and ARCHER, Circuit Judges.

NIES, Chief Judge.

This is an appeal from the United States Claims Court's grant of summary judgment in favor of the government, *Pine Products Corp. v. United States,* 19 Cl.Ct. 691 (1990), on plaintiffs' claim for a refund of a portion of the amount paid by plaintiff Joint Venture for buy-out of its contract to harvest timber in accordance with the Federal Timber Contract Payment Modification Act, 16 U.S.C. § 618 (1988) (Timber Act). We affirm.

## BACKGROUND

In the late 1970's, economic factors of accelerating inflation and great demand led many companies to contract for the purchase of federally-owned timber at high prices. Such contracts require the purchaser to cut a minimum amount of timber over a number of years for which it must pay the government the contract price. In 1980, Pine Products and Timber Investors created a joint venture (hereinafter "Venture") for the purpose of bidding on the Fawn Spring Timber Sale Contract which covered an estimated 20.6 million board feet ("mbf") of ponderosa pine and Douglas fir to be cut from the Ochoco National Forest. Their joint venture agreement specifically provided that the parties would "contribute equally" to the capital necessary for the purchase of the timber and to the performance of all the terms and conditions of performance of the Fawn Spring contract. The agreement further provided that each party would "share one half" of all the obligations, burdens and benefits of the joint venture agreement.[1] Venture began operations in mid–1980 upon award of the Fawn Spring contract.

A reversal in inflation and housing trends occurred in the early 1980's and led to a significant downturn in market prices for lumber. Timber companies were faced with the prospect of suffering substantial losses in instances where they were committed to paying the high prices fixed in their government contracts for timber which could be sold only at much lower market prices. Because of the effect this would have on the economies of certain regions, Congress enacted the Timber Act allowing government contractors to be released from part of their contractual obligations to cut and pay for timber at the unprofitable prices. *See* Pub.L. No. 98–478, § 2, 98 Stat. 2213 (1984).

Under the Timber Act, purchasers under contract to purchase timber from the Secretary of Agriculture or Interior entered during a particular time frame are offered the option of buying out a portion of their obligations. *See* 16 U.S.C. § 618(a)(7)(C) (1988). This option, however, extends only to *purchasers* under qualifying federal timber sales contracts and is limited to specific volumes of timber.[2] In general, the buy-out charge is calculated by comparing the purchaser's potential loss on qualifying contracts with its net book worth. If the purchaser's loss exceeds 100 percent of the purchaser's net book worth, the rate is $10 per mbf; if that loss falls between 50 and 100 percent of its net book worth, the rate is the greater of $10 per mbf or 10 percent of the contract overbid;[3] and if the loss is less than 50 percent of the net book worth, the rate is the greater of $10 mbf or 15 percent of the contract overbid up to 125 mbf with the percentage increasing in stepwise fashion until the 200 mbf limit is reached. *Id.* In addition, the Timber Act provides that purchasers who elect not to utilize loss and net book worth determinations may still buy out of their contracts at the highest rate. *See* 16 U.S.C.

---

1. The agreement also provided for changing apportionment of the harvested timber from the equal distribution called for therein by mutual agreement of the parties.

2. For example, to qualify, such contracts, *inter alia,* had to be bid prior to January 1, 1982, held as of June 1, 1984, and be for an original con-

tract period of 10 years or less. *See* 16 U.S.C. § 618(a)(2)(A), (B) and (C).

3. The Timber Act defines the "contract overbid" as the difference between the contract rate as initially advertised and the rate bid by the purchaser. *See* 16 U.S.C. § 618(a)(3)(F).

§ 618(a)(3)(D). The volume of qualifying timber is multiplied by the applicable rate to arrive at the buy-out charge. *See* 16 U.S.C. § 618(a)(3)(A).

In calculating the purchaser's buy-out charge, the Timber Act mandates that the purchaser and its affiliated companies be treated as a single entity for purposes of determining a purchaser's buy-out limitation and net book worth. *See* 16 U.S.C. § 618(a)(7)(A). The volume of timber held under qualifying contracts by any affiliated companies and the buy-out rights which affiliates exercise must be cumulated. Likewise, to determine the buy-out rate for a purchaser, the net book worth of affiliated companies must be combined. Otherwise, the purchaser "elects" the highest rate. 16 U.S.C. § 618(a)(3).

Pursuant to the Timber Act, Venture submitted an application to the United States Forest Service for buy-out of the Fawn Spring contract. The Forest Service rejected its application because Venture, while disclosing that Pine Products and Timber Investors were 50 percent owners, did not list the concerns as "affiliates" or include figures for those concerns in its buy-out limitation and buy-out charge calculations. *Pine Products Corp. v. United States,* 15 Cl.Ct. 11, 13 (1988). Upon resubmission, Venture listed both Pine Products and Timber Investors as its "affiliates" and included their volume of timber and buy-out on their individually held contracts, but did not disclose the net book worth of Timber Investors.

The Forest Service then cumulated the volume of eligible timber under the Fawn Spring contract of Venture (Venture's only contract) and under the separate contracts on which Pine Products and Timber Investors were individually the original purchasers, and determined that Venture was entitled to buy out the remaining 12.565 mbf of uncut timber of the Fawn Spring contract. However, because Venture's application disclosed no information on the net book worth of its affiliate, Timber Investors, the Service held that the buy-out rate was 15 percent of the contract overbid, which amounted to $30.51 per mbf. Based on this rate, Venture had to pay $383,358.15 for the buy-out of the Fawn Spring contract.

Pine Products then filed an administrative appeal pursuant to 36 C.F.R. §§ 211.18 and 223.182 (1986), which authorize agency review of Forest Service buy-out determinations. It sought a refund of $128,839, alleging that it was entitled to have a lower rate applied to one half of the joint venture's buy-out volume based on its ratio of loss to net book worth. The appeal was denied and became the final administrative decision of the Department of Agriculture when the Secretary of Agriculture declined to exercise discretionary review. *See* 36 C.F.R. § 211.18(f)(2)–(6) (1989).

Pine Products proceeded to file suit in the Claims Court for recovery of the alleged overcharge, but that suit was dismissed. The court reasoned that the suit was on a claim of Venture and that Timber Investors, co-venturer, was an indispensable party. *See Pine Products Corp.,* 15 Cl.Ct. at 13–14. While dismissing the suit on jurisdictional grounds, the Claims Court at that time issued an "advisory ruling" agreeing with the Forest Services' determination of the buy-out rate applicable to Venture. *Id.* at 15–17. Thereafter, a new complaint was filed asserting the same claim but with Venture and Timber Investors added as plaintiffs. On cross-motions for summary judgment, the Claims Court decided the case on the merits and concluded that Venture's buy-out rate was properly determined. The Claims Court, largely on reasoning identical to that of the Forest Service, held that Pine Products and Timber Investors each were "affiliates" of Venture within the meaning of the Timber Act. It reached that conclusion because each was a 50 percent owner of Venture and had the power to exercise negative control over Venture. The Claims Court then held that, under the statute, the *purchaser* is the point of reference for determining the buy-out charge and the purchaser and its affiliates must be treated as a single entity. This result, per the Claims Court, followed from the statutory language, the legislative history, and the need to prevent manipulation of buy-out charges. By failing to disclose the net

book worth of its "affiliate", Timber Investors, Venture "elected" the highest buy-out rate. Plaintiffs then filed an appeal to this court pursuant to 28 U.S.C. § 1295(a)(3) (1988).

## DISCUSSION

The grant or denial of summary judgment by the Claims Court is a ruling on a matter of law which this court reviews *de novo. See Allstate Ins. Co. v. United States,* 936 F.2d 1271 (Fed.Cir.1991); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). As noted by the Claims Court, appellants' disagreement over the buy-out rate applicable to Venture's Fawn Spring contract centers entirely on the agency's interpretation of subparagraphs 618(a)(7)(A) and (B) of the Timber Act. These subparagraphs require that affiliated companies be treated as a "single entity" in determining the availability of buy-out and the applicable buy-out rate and provide the definition for what is an "affiliate".

Appellants put forth a two-prong attack on the government's calculation of Venture's buy-out charge: first, they contend that neither Pine Products nor Timber Investors' is an "affiliate" of Venture, and second, even if they are "affiliates" of Venture, the affiliation creates two "single" entities, namely (1) Pine Products/Venture and (2) Timber Investors/Venture, rather than one entity, Venture/Pine Products/Timber Investors, inasmuch as Pine Products and Timber Investors were not found to be affiliates of each other. Thus, per appellant, in view of this "dual" affiliation, the buy-out charge should be separately determined for each of the two entities, and the figures for the Pine Products/Venture entity entitle that entity to a lower buy-out rate.

The standard for judicial review of an agency's interpretation of a statute it has been assigned to administer was recently applied by the Supreme Court to uphold regulations promulgated by the Department of Health and Human Services under Title X of the Public Health Service Act, 42 U.S.C. §§ 300 to 300a–6, in *Rust v. Sulli-*

*van,* —— U.S. ——, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Therein, the Court assessed the validity of the regulations by first acknowledging that the statutory language upon which the regulations were based was ambiguous. The Court then explained that

[i]f a statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron [U.S.A., Inc. v. Natural Resources Defense Council, Inc.],* 467 U.S. [837], [ ] 842–843 [104 S.Ct. 2778, 2781–2782, 81 L.Ed.2d 694] [ (1984) ].

The Secretary's construction of Title X may not be disturbed as an abuse of discretion if it reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' expressed intent. *ibid.,* In determining whether a construction is permissible, "[t]he court need not conclude that the agency construction was the only one it could permissibly have adopted ... or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.,* at 843, n. 11 [104 S.Ct. at 2782, n. 11]. Rather, substantial deference is accorded to the interpretation of the authorizing statute by the agency authorized with administering it. *Id.,* at 844 [104 S.Ct. at 2782].

*Id.* 111 S.Ct. at 1767. The Court then proceeded to uphold the regulations in question as a permissible construction of the statute. *See also, Republic Aviation Corp. v. Labor Board,* 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); *Labor Board v. Hearst Publications, Inc.,* 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); *National Broadcasting Co. v. United States,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).

Like the Supreme Court in *Rust,* we acknowledge that appellants present a plausible interpretation of subparagraphs 618(a)(7)(A) and (B). But whether appellants' proffered interpretation represents a reasonable construction of these subpara-

graphs of the Timber Act is not the question. Rather, we must inquire whether the agency's interpretation is unreasonable in light of the statutory language and legislative intent. *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (stating that agency interpretation of statute is entitled to great deference by courts).

### The Statute

The particular provisions we must construe are the following:

(7)(A) For purposes only of determining a purchaser's buy-out limitation under paragraph (2) and net worth in connection with buy-out cost under paragraph (3), concerns which are affiliates as defined under subparagraph (B) of this paragraph shall be treated as a single entity.

(B) Definition of affiliates: Concerns are affiliates of each other when either directly or indirectly, one concern controls or has power to control both. In determining whether or not affiliation exists, consideration shall be given to all appropriate factors, including, but not limited to, common ownership, common management, and contractual relationships.

### Affiliation

■ Regarding subparagraph (B) quoted above, which defines who is an "affiliate", the statute hinges a concern's status as an "affiliate" on the concept of direct or indirect control or power to control another concern. Appellants contend that the statutory language "one concern controls ... the other" precludes a definition of "affiliate" that is broad enough to cover the situation where two entities simultaneously exert "negative control," such as occurs when two joint venturers with 50 percent shares in the joint venture can each block action by the joint venture. While it is plausible to interpret the statutory language restrictively as appellants desire, we are unconvinced that the Forest Service's interpretation of "control" is *precluded* by the statute or its legislative history.

The Ninth Circuit, in *Mt. Adams Veneer Co. v. United States*, 896 F.2d 339 (1990) was faced with the very question whether the Forest Service could reasonably treat each of two coequal owners of a joint venture partnership as "affiliates" of the joint venture purchaser within the meaning of subparagraph 618(a)(7)(B). That case dealt with whether the volume of timber bought out by the two joint venturers under their individual contracts had to be taken into account in determining their joint venture's eligibility for buy-out. If included, the joint venture was over the limit on entitlement. The Ninth Circuit concluded that an interpretation that equally split interests in the joint venture created "affiliates" was "permissible," "[b]ased on the Senate Reports." *Id.* at 342. The government here relies on these same Senate reports as support for the agency's interpretation of "affiliate," and we are persuaded, as was the Ninth Circuit, that the contents of these reports establish the reasonableness of the Forest Service interpretation. As explained by the Ninth Circuit:

the Senate Report ... states that the definition of the term "affiliates" was adopted from the definition used by the Small Business Administration (SBA) and indicates the SBA regulations should be used as a guide in determining affiliation. S.Rep. No. 98–596, 98th Cong., 2d Sess. 12, reprinted in 1984 U.S.Code Cong. & Admin.News 3796, 3805.

The SBA definition of affiliation is "[e]very business concern is considered as having one or more parties who directly or indirectly control or have the power to control it. Control may be affirmative *or negative* and it is immaterial whether it is exercised so long as the power to control exists." 13 C.F.R. § 121.3(a)(i) (1987).

*Id.* at 342 (emphasis in original).

That the statute refers to *one* concern controlling another does not preclude the concept of two concerns, each with *negative* control in the case of a coequally owned joint venture. The SBA regulations list a joint venture as a business entity for purposes of determining affiliation status

and provide as an example of negative control "affiliate" status, the situation where a party owns 50 percent of another entity. *See* 13 C.F.R. §§ 121.3(a)(1) example, 121.3(a)(vii)(A). By virtue of these Senate reports indicating that subparagraph 618(a)(7)(B) of the Timber Act was adapted from the SBA regulations and its statement that these regulations were to provide a guidepost for determining "affiliation" status under the Timber Act, the agency's interpretation of the statute, that Pine Products and Timber Investors are "affiliates" of Venture, is permissible.

### One or Two Entities for Buy–Out

■ Appellants argue that the finding that Pine Products and Timber Investors are affiliates of Venture is not fatal to their appeal. As appellants would have it, the Forest Service still overcharged Venture by treating Pine Products/Timber Investors/Venture as a "single entity." Per appellants, once a finding of "dual" affiliation is made, subparagraph 618(a)(7)(A) requires that the buy-out limitation and net book worth must be determined by focusing on the "entity" created by the affiliated concerns. Per appellants, two "entities" were created by affiliation, namely, Pine Products/Venture and Timber Investors/Venture, and the buy-out limitation and buy-out charge should be determined for the Pine Products/Venture "entity" separately from that for the Timber Investors/Venture "entity." After Venture's first application for buy-out was rejected, appellants amended and resubmitted their applications, dividing the timber volume of the Fawn Spring contract equally between the co-venturers and including that amount in each of their separate buy-out applications.

It may be plausible to interpret subparagraph 618(a)(3)(A)'s "single entity" requirement to mean that, while affiliates of the purchaser must be taken into account, all affiliates need not necessarily be cumulated into one entity. Venture's buy-out limitation and net book worth would then be calculated separately for each of the two "single entities" of which it is a part.

But again, the plausibility of the interpretation urged by the appellants is not in issue. We are faced with assessing the reasonableness of the agency's interpretation of subparagraph (A). Under the Forest Service's interpretation of subparagraph (A), the "single entity" requirement focuses on the *purchaser* under a contract and its affiliates. Because Venture is the "purchaser," Venture together with both of Venture's affiliates becomes the "single entity" specified in this provision for determining eligibility and buy-out rate. Under this interpretation, the failure to disclose Timber Investors' net book worth results in Venture's entire eligible timber volume being assigned the highest buy-out rate. While this interpretation results in the highest buy-out rate being assigned to the entire eligible contract volume held by the purchaser because an affiliate of the purchaser chose not to disclose its net book worth, we are unpersuaded that such an interpretation is unreasonable.

The Forest Service interpretation implements general principles of law applicable to joint ventures. Regardless of how a joint venture agreement divides liability as between the joint venturers, the joint venturers vis-a-vis a third party with whom the joint venturer contracts are not liable merely for half of its contractual obligations. This is so because general principles of partnership law are applicable to joint ventures, and under general partnership law, a partner is jointly and severally liable for obligations and debts of the partnership. *See Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. H.F. Johnson, Inc.*, 830 F.2d 1009, 1014–15 (9th Cir.1987) (joint ventures treated as partners); J. Crane and A. Bromberg, *Law of Partnership*, § 35 at 189–195 (1968) (same); Uniform Partnership Act, § 15 (partners are jointly and severally liable for third party obligations and debt chargeable to the partnership); *Wheatley v. Carl M. Halvorson, Inc.*, 213 Or. 228, 323 P.2d 49 (1958) (Uniform Partnership Act adopted in Oregon); A. Bromberg and L. Ribstein, *Bromberg and Ribstein on Partnership*, § 1.03(4) (1990) (partners are jointly and severally liable for third party

obligations and debt chargeable to the partnership); *see, e.g., Faison v. Nationwide Mortgage Corp.,* 839 F.2d 680 (D.C.Cir. 1987), *cert. denied sub nom.,* 488 U.S. 823, 109 S.Ct. 70, 102 L.Ed.2d 46 (1988) (parties to a joint venture would be liable jointly and severally as joint tortfeasors where tort allegedly committed by co-venturer); *Tehran–Berkeley Civil and Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton,* 888 F.2d 239 (2d Cir.1989) (party to joint venture subject to arbitration clause of contract entered by joint venture). Here, Venture is the purchaser from the government under the Fawn Spring contract and is the entity required to render performance under the contract. Pine Products and Timber Investors as joint venturers were liable to the government for performance of the entirety of that contract individually, not merely for half of it. As purchaser, Venture is entitled under the Act to enter into a new contract, a contract to buy-out, subject to certain conditions. Again, the joint venturers became liable on the entirety of the new buy-out obligation, not merely on half of it.[4] Thus, appellants' conclusion that making Pine Products and Timber Investors each responsible for only half of the buy-out of the Fawn Spring contract comports with their obligations to the government is erroneous. Each would be relieved of obligations beyond those provided in the statute.

Indeed, the Forest Service's interpretation is rational in light of the purpose for inclusion of subparagraph (A) within the Timber Act. This subparagraph was enacted amidst concern that the buy-out charges might be manipulated by companies.

> The purpose of this provision [16 U.S.C. § 618(a)(7)(A)] is to assure that companies which buy timber under several names do not receive separate buy-out allocations for each purchasing entity, and to assure that a company's buy-out cost is not inequitably low simply because purchases are made in the name of one entity while the bulk of the net worth is retained under the name of another entity.

S.Rep. No. 98–596, 98th Cong.2d Sess. 4, 12 *reprinted in* 1984 U.S.Code Cong. & Admin.News 3796, 3805. In the joint venture context, the possibility for manipulation of buy-out between the joint venturers is present. In *Mt. Adams,* joint venturers sought to exceed the volume limitation. Here, they seek to avoid the rate applicable to the joint venture by dividing the timber volume between them and being treated as separate entities. However, if a refund of the buy-out charge were made on the basis of computations relating to one joint venturer, Pine Products only, Venture could simply distribute the refund equally between the joint venturers—indeed, could be *obligated* to do so under the joint venture agreement. Similarly if a claim were recognized in Pine Products/Venture as an entity, that same distribution of a refund could occur or be required under the joint venture agreement. The effect would be that Timber Investors/Venture would receive a lower charge than permissible on its "share" of the buy-out. However, as we have pointed out, the concerns contracted as a joint venture to obtain the Fawn Spring contract and it is only through that entity that they may participate in the statutory right to buy-out. Having received the benefit from acting as a joint venture to obtain the contract originally, they now are being held to the disadvantage of that relationship as well. There is simply no *requirement* in the statute for the Forest Service to treat them as two separate purchasers or to make calculations as if they were.

In sum, the Forest Service's interpretation serves as a reasonable interpretation of subparagraph (A) and implementation of its legislative purpose. Given this rationale, we cannot say that the agency's interpretation of the "single entity" requirement, to include cumulation of *all* affiliates with the purchaser before determining buy-out rate, is impermissible. Therefore, on

---

**4.** For example, buy-out payments may extend over a number of years. If divided responsibility were recognized, the government would lose an entity otherwise responsible in the event of default. But this is not the law. *See supra* at 1560.

judicial review, we are constrained to defer to it.

## CONCLUSION

Because the Forest Service's interpretation of the Timber Act is reasonable, the decision of the Claims Court disallowing recovery of a portion of the Joint Venture buy-out charge is

AFFIRMED.

PAULINE NEWMAN, Circuit Judge, dissenting.

I respectfully dissent, for this decision provides inadequate implementation of the statutory purpose. Although the majority discusses the finer points of affiliation, joint ventures, and partnership law, the analysis is incomplete insofar as it concerns the case before us, and the conclusion reached does not accommodate the express intention of the lawmakers.

The implementing regulations require that for the Federal Timber Contract Payment Modification Act, 16 U.S.C. § 618, the effect of joint ventures will be decided on a case-by-case basis:

**36 CFR § 223.170  Definitions.**

*"Affiliate."* Concerns are affiliates if directly or indirectly, (a) either one controls or has the power to control the other, or (b) one or more third parties controls or has the power to control both. In determining whether or not affiliation exists, the Forest Service shall consider all appropriate factors, including, but not limited to, common ownership, common management, and contractual relationships....

*Provided further,* ... The Forest Service will determine the effect of joint venture agreements upon affiliation on a case-by-case basis based upon the nature of the relationship established by the joint venture.

This is a *proviso,* not a precatory hope. The issues requiring decision are not whether Timber Investors and Pine Products are each affiliates of the joint venture or of each other, or whether joint venture participants are subject to the laws of partnership—the issues into which the panel majority has been diverted. The case-by-case determination of § 223.170 requires consideration of the facts of this particular case.

For example, it is undisputed that the price of buyout for Timber Investors, for all its holdings subject to the Act, is 300% higher than that of Pine Products. *See* 16 U.S.C. § 618(a)(3)(A) (buy-out rate proportional to net book worth). The relative situations of these joint venture partners, and all other facts specific to this case, are material to implementation of the Act in accordance with its purpose of aiding small and medium sized businesses:

> It is estimated that if all the timber purchasers were to go ahead and log the timber under contract and product the lumber and plywood, they would lose nearly $4 billion.... With the downturn in the market those damages will be overwhelming to small and medium sized businesses [which] could face bankruptcy. The Government could not collect its damages from bankrupt companies, workers would lose their jobs, and timber dependent communities already in precarious situations, would lose their main employer.

S.Rep. No. 98–596, 98th Cong., 2d Sess. 5, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3796, 3797–98. The nature of this relief act, which provides relief measured by the net worth of the purchaser, requires that this factor be considered in making the case-by-case determination for joint ventures that section 223.170 requires. Remedial legislation should be implemented in a way that serves the class it is intended to benefit. *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967).

The court today holds, apparently as a bright-line rule, that when one joint venture partner is limited to the higher rate of buyout, the other partner is required to pay the higher rate—whatever the net worth of the latter partner. This holding eliminates case-by-case consideration. The regulation that requires individual consideration in this specified circumstance must be com-

plied with; and compliance must, in turn, implement the statute as Congress intended.

The Claims Court's summary judgment was improvidently granted, and should be reversed.