DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - ) | |
| ) | |
| IAP Worldwide Services, Inc. ) | ASBCA Nos. 62638, 63879 |
| ) | |
| Under Contract No. W912D1-05-D-0011 *et al.* ) | |

APPEARANCES FOR THE APPELLANT:  J. Alex Ward, Esq.
R. Locke Bell, Esq.
Caitlin A. Crujido, Esq.
  Morrison & Foerster LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT:  Samuel W. Morris, Esq.
  DCMA Chief Trial Attorney
Amelia R. Lister-Sobotkin, Esq.
Adrianne L. Goins, Esq.
  Trial Attorneys
  Defense Contract Management Agency
  Chantilly, VA

OPINION BY ADMINISTRATIVE JUDGE EYESTER
ON CROSS MOTIONS FOR SUMMARY JUDGMENT

The issue in this appeal is how to treat legal costs appellant IAP Worldwide Services, Inc. (IAP) incurred defending lawsuits arising out of its agreement with a former local sponsor for business operations in Kuwait. IAP contends the legal defense costs are allowable litigation costs and can therefore be included in IAP's incurred cost proposals. The Defense Contract Management Agency (DCMA) contends these costs are expressly unallowable pursuant to Federal Acquisition Regulation (FAR) 31.205-47(f)(5), because they were costs incurred in connection with the defense or prosecution of a lawsuit or appeal concerning an IAP joint venture (or other similar type arrangement).

The parties have filed cross motions for summary judgment. Based on the following, we grant DCMA's motion and conclude the costs are expressly unallowable.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

*The Agreement with Mr. Al Ghanem*[1]

1.  IAP has supported the U.S. military in the Middle East for several years (JSF ¶ 1).  As relevant here, the United States and its allies invaded Iraq on March 19, 2003. (JSF ¶ 3)

2.  Just prior to this, on February 10, 2003, IAP entered into an agreement titled "Joint Venture Contract" (JVC) with Mr. Adel Y. Al Ghanem, of Kuwait (JSF ¶ 4). The preamble, which is the "essence of the JVC," explains that:

> [Mr. Al Ghanem] has extensive expertise and [is] capable of providing local business, administrative and logistical support and having [a] business reputation renowned in Kuwait. . . . [IAP] has expertise in providing and fulfilling the various suppl[y] needs of [the] US [A]rmy, in addition to their previous well-known works with the US Army around the world. . . .

(R4, tab 1 at 1-2)[2]

3.  The agreement iterated that IAP and Mr. Al Ghanem "agreed to establish a Joint Venture Company, with limited liability, to undertake various supply, support and services needs in particular of the US Army or others in Kuwait & Iraq" (JSF ¶ 4). As described in the preamble, Mr. Al Ghanem was to provide "any possible local administrative legal and logistical support to the JVC" (JSF ¶ 6; R4, tab 1 at 2).  IAP was "responsible for the company's management, professionally, administratively and technically" (JSF ¶ 7).  In addition, IAP, via its U.S. office, was to support the operations and meet the U.S. Army's requirements for staff and travel within the United States and other countries (R4, tab 1 at 2).

4.  Ownership of the joint venture company was "split equally between the two parties" on a ratio of 51/49, with 51 percent to Mr. Al Ghanem and 49 percent to IAP (JSF ¶ 4).  All contracts were to be issued in IAP's name (JSF ¶ 8).  This was not meant to "jeopardize" Mr. Al Ghanem's profit (R4, tab 1 at 3).

5.  In addition, all payments from the U.S. Government were to be paid to IAP

---

[1] The parties used the spelling Al Ghanem and noted that alternative spellings included Al Ghanim and Al-Ghanim (Joint Stipulation of Facts (JSF) ¶ 4 n.1).

[2] Rule 4 references are to the Bates-stamped page numbers.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

"and thereafter credited to the JVC" (JSF ¶ 9). Specifically, the agreement required "[p]rofits accrued to the JVC [] be disbursed upon receipt of payment from each contract minus 10% which will be deposited in the account of the JVC" which was to be established (R4, tab 1 at 3; JSF ¶ 9). The remaining profits were to be disbursed to IAP and Mr. Al Ghanem "upon receipt of payment from each contract" (JSF ¶ 9). As noted, since IAP was to provide management support, it was to receive 5 percent "from the net profit towards such support and costs related to [the] JVC Business" (JSF ¶ 7). Both IAP and Mr. Al Ghanem would be reimbursed for their operational expenses as well as any money advanced by a party (JSF ¶ 9; R4, tab 1 at 2). The operational expenses were to be charged to the joint venture prior to the disbursement of any profits (R4, tab 1 at 3). The agreement was silent as to the sharing of losses (JSF ¶ 10).

6. According to the agreement, Kuwaiti law governed "any disputes that may arise relating to this contract and the Kuwaiti court only are competent" (JSF ¶ 11).

7. On May 2, 2004, IAP and Mr. Al Ghanem amended their agreement (JSF ¶ 13). The amendment removed and replaced the paragraph stating IAP would receive 5 percent net profits for the support and costs of the joint venture. The new paragraph explained that IAP would receive 5 percent of all costs of the joint venture as a general administration (G&A) fee for reimbursement of support and costs related to the joint venture's contracts. (R4, tab 2 at 5)

8. The amendment also added a paragraph to provide that IAP would be paid a "management fee" for contracts performed in Kuwait (JSF ¶ 14). From February 10, 2003 through March 31, 2004, IAP was to receive a management fee of 5 percent and thereafter, a fee of 20 percent (R4, tab 2 at 5).

9. The amendment changed the paragraph on profits, as well. It required IAP pay the distributions of net profits within 30 days of IAP's receipt of payment, and that IAP place 10 percent of each distribution into the joint venture's account. At the end of each year, funds in the joint venture account exceeding the amount required under Kuwaiti law were to be distributed as net profit. The joint venture account was controlled, or to be controlled, by both parties. (R4, tab 2 at 6)

10. The amendment did not change the ownership structure of the joint venture (see R4, tab 2 at 6). It clarified that Mr. Al Ghanem received 51 percent of the joint venture's net profit and IAP received 49 percent. However, as noted above, IAP still received the G&A and management fees. In sum, the amendment defined net profits "as gross profit less the [G&A] Fee and Management Fee, which were to be paid to IAP." (JSF ¶ 15)

11. Further, per the amendment, IAP was to provide Mr. Al Ghanem supplemental schedules that were part of the audited financial statements of the joint

3

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

venture, and unaudited financial statements (R4, tab 2 at 6). The amendment also clarified that all the contracts of the joint venture issued in IAP's name included those to provide supplies, support and services for the U.S. Army "or others in Kuwait and Iraq" (*id.* at 5). It also included those performed "directly or indirectly" by IAP (*id.* at 6).

12. The amendment required "[a]ny and all amendments or modifications to the [Joint Venture] Contract . . . be in writing and signed by both parties" (JSF ¶ 16). The amendment also added a new paragraph, stating as follows and in relevant part:

> The parties undertake to execute appropriate amendments to the Memorandum of Association of the limited liability company (Joint Venture Company) in terms of the draft attached herewith. The parties shall sign the amendments to the Memorandum of Association in the presence of the Notary Public within two (2) months of the date of this amendment. This amendment and the Joint Venture Contract dated February 10, 2003, constitutes the entire agreement between the parties. In the case of [] any discrepancy between [] the Joint Venture Contract as hereby amended and the Memorandum of Association of the limited liability company, the provisions of the Joint Venture Contract as amended hereby shall prevail and be binding upon the parties.

(R4, tab 2 at 7) IAP and Mr. Al Ghanem did not execute any other amendments or modifications to the agreement (JSF ¶ 17). There is no copy of the Memorandum of Association of the limited liability company in the record.

*IAP Contracts*

13. The record includes examples of IAP contracts performed in Kuwait. For example, under its "Heavy Lift" contract (Contract No. W912D1-05-D-0011), issued on April 15, 2005, IAP transported supplies and equipment from Kuwait to Iraq for the U.S. Army. Pursuant to its Air Force Contract Augmentation Program (AFCAP) contract (Contract No. F08637-02-D-6999), IAP performed construction, operations, and maintenance services in Kuwait for the U.S. Air Force. (JSF ¶ 1) The representative delivery order for the AFCAP contract included a cost plus award fee contract line item number and the allowable cost and payment clause, FAR 52.216-7 (R4, tab 38 at 1130, 1175).

14. At least some of IAP's contracts incorporated FAR clause 52.236-7,

4

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Permits and Responsibilities. FAR 52.236-7 states, in part:

> The Contractor shall, without additional expense to the
> Government, be responsible for obtaining any necessary
> licenses and permits, and for complying with any Federal,
> State, and municipal laws, codes, and regulations
> applicable to the performance of the work.

(JSF ¶ 2; R4, tab 3 at 102) Likewise, the AFCAP order included a "Host Nation Requirements" clause stating IAP would be responsible for obtaining all necessary licenses, permits, visas and complying with laws, codes and regulations of the host country (R4, tab 38 at 1191).

15. And IAP's Heavy Lift contract included the following requirement:

> 2.4 Scope: The contractor will provide the leasing/rental of
> heavy lift equipment for movement of equipment, cargo
> and personnel within the theater of operations, up to 1000
> kilometers from Camp Arifjan. All vehicles, associated
> equipment and services provided shall be safely operable;
> shall meet the intended functions and operations of like
> new conditions; and be in accordance with this [performance
> work statement], the contract and local laws and regulations.

(JSF ¶ 2; R4, tab 3 at 69) The contract also required IAP to have an established site for conducting operations and dispatching trucks located within 60 kilometers from Camp Arifjan (R4, tab 3 at 72). The contract included Defense Federal Acquisition Regulation Supplement (DFARS) 252.233-7001, CHOICE OF LAW (OVERSEAS) (JUNE 1997), which explained that the "contract shall be construed and interpreted in accordance with the substantive laws of the United States of America" (R4, tab 3 at 107).

*The End of JVC and the New Agreement*

16. On September 30, 2005, IAP sent a letter titled "Notice of Termination for Joint Venture Contract" to Mr. Al Ghanem (JSF ¶ 18). The letter stated that it "serves as an official notice to you that IAP Worldwide Services is hereby terminating the Contract effective September 30, 2005" (JSF ¶ 18). Further, the letter stated IAP's position that it "is not a shareholder in any entity that is owned by" Mr. Al Ghanem or any of his companies (app. supp. R4, tab 34).

17. IAP provided a proposed "Transition and Termination Agreement" to Mr. Al Ghanem, but it was never executed by the parties (JSF ¶ 18). According to the

5

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

unexecuted agreement, the JVC identified in the parties' signed agreement "never formed." The unexecuted agreement contained a provision that Mr. Al Ghanem would, for a maximum of 90 days after termination: continue to sponsor the residence/visit visas and work permits for IAP's employees; keep the registration of IAP's leased and purchased vehicles valid; keep the leases and utilities for IAP's office space and IAP employees' housing in its name; and keep IAP's bank account with the National Bank of Kuwait in Kuwait in its name and refrain from using it in any manner. Further, with respect to the bank account, IAP wanted Mr. Al Ghanem to allow IAP to withdraw all of its money and then change the name of the account holder to delete any reference to the term IAP. (App. supp. R4, tab 41 at A-05) IAP also wanted Mr. Al Ghanem to change the name of the company he had formed with Mr. Ahmad A. Al Ghanem, which was called "Al Ghanim IAP General Trading/Adel Al Ghanim & Partner Ltd," to delete the reference to IAP (*id.* at A-07).

18. IAP then entered into an agreement on October 1, 2005, with Abdulredha A. Khoursheed to serve as IAP's local sponsor in Kuwait (JSF ¶ 19). Pursuant to the agreement, Mr. Khoursheed would act as IAP's service agent in Kuwait and would receive remuneration based on a varying percentage, ranging from two percent to one-half of a percent, of gross revenues for cost plus contracts awarded to IAP in Kuwait (JSF ¶ 19). The agreement was titled a "Service Agency Agreement" (R4, tab 4 at 110). In the agreement, Mr. Khoursheed was referred to as an agent or service agent, appointed by IAP to provide certain services (R4, tab 4 at 110).

19. Pursuant to the agreement, IAP would pay Mr. Khoursheed a percentage of gross revenues based on the type and value of the contract (e.g., 2 percent of gross revenues of cost plus contract valued up to $100 million) (R4, tab 4 at 111). The agreement explains that Mr. Khoursheed is an independent contractor and not an employee of IAP and could not bind IAP or act for it (R4, tab 4 at 120). The parties extended the agreement via an amendment dated October 1, 2007 (R4, tab 10).

*IAP Litigation*

20. Meanwhile, on March 26, 2006, Mr. Al Ghanem initiated litigation in the Kuwait Court of First Instance against IAP alleging breach of contract (referred to by the parties as the Kuwait Litigation) (JSF ¶ 20). Throughout that litigation, IAP argued that IAP and Mr. Al Ghanem "agreed to establish a company with limited liability for a joint venture," but disputed that such company was ever formed between the parties (JSF ¶ 20).

21. On November 16, 2016, the Kuwait Court of First Instance found in favor of Mr. Al Ghanem and issued a judgment against IAP (JSF ¶ 21). According to the translated Kuwait judgment, Mr. Al Ghanem stated he had created a limited liability

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

company with his son.[3]  IAP wished to replace Mr. Al Ghanem's son in the limited liability company as set forth in the amendment to the JVC.  However, IAP did not officially record/notarize the contract dated 05/02/2004 with the Real Estate Registration and Notarization Department, which inferred IAP wished to withdraw from the joint venture agreement.  (R4, tab 12 at 180)

22.  The Kuwaiti judgment explained that under Kuwaiti law, a company "is a contract under which two persons or more undertake to contribute in a financial enterprise either through funds or work to share the generated profit or loss" (R4, tab 12 at 184).  The court also stated that pursuant to Kuwaiti law a "joint venture is a commercial partnership formed between two person or [more] without being a corporate body" but the partners have recourse against each other regarding the partnership business (R4, tab 12 at 185).  The court found the JVC was evidence the parties "agreed to form a joint venture partnership" despite IAP's arguments that the parties had only conducted negotiations.  As the parties never actually formed a separate limited liability company, the court relied on the "joint venture partnership agreement."  (R4, tab 12 at 186)

23.  IAP and Mr. Al Ghanem both appealed to the Kuwait Court of Appeal (JSF ¶ 22).  On March 22, 2017, the Kuwait Court of Appeal found IAP liable to Mr. Al Ghanem in the amount of $78,779,449 U.S. dollars, plus reasonable expenses, attorney fees, and post-judgment interest (JSF ¶ 22).  The appellate court explained further its law on commercial companies, notably, that a joint venture is a commercial partnership between two or more persons that does not have legal personality and is not valid in regard to third parties (R4, tab 12 at 224).  However, the partners have recourse against each other per the terms of their agreement.  Further, the court noted that if the agreement does not provide for how losses are distributed, "such losses will be divided according to the agreed upon percentage in terms of profits."  (*Id.* at 225)

24.  On January 24, 2018, Mr. Al Ghanem initiated proceedings in state court in Florida for recognition of the Kuwaiti judgment (referred to by the parties as the Florida Litigation) (JSF ¶ 23).  In its pleadings, IAP noted that it had collaborated with Mr. Al Ghanem for almost 2.5 years, for which he "was duly compensated" (R4, tab 19 at 484).  The Florida court concluded the Kuwait Judgment should be recognized (gov't reply, ex. A).  IAP has now defended itself in legal proceedings

---

[3] There are two versions of the Kuwaiti court's rulings in the Rule 4 file.  We understand the variations in terminology are due to the translations.  We reference the version utilized by the parties.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

brought by Mr. Al Ghanem in both Kuwait and the United States (JSF ¶ 24).[4]

*IAP's Consolidated Financial Reports*

25. In 2017, IAP provided its consolidated financial report to DCMA (R4, tab 13 at 303). IAP explained its various government contracts, noting those that were typically cost plus (R4, tab 13 at 312). Upon review of the report, in November 2017, DCMA stated the legal costs with Mr. Al Ghanem were unallowable pursuant to FAR 31.205-47(f)(5), because they were costs incurred in connection with the defense or prosecution of a lawsuit or appeal concerning an IAP joint venture. As a result, DCMA adjusted IAP's pool costs for provisional billing rates. (*Id.* at 300) Earlier, in 2012, IAP had also classified such costs as unallowable but later reclassified them as allowable (R4, tab 14 at 338).

26. On February 7, 2018, the Defense Contract Audit Agency (DCAA) advised the contracting officer that it considered the Kuwait litigation costs expressly unallowable pursuant to FAR 31.205-47(f)(5)(i). Specifically, DCAA concluded the agreement between IAP and Mr. Al Ghanem was a joint venture arrangement because there was a shared interest as opposed to a services or sponsorship agreement. (R4, tab 17 at 349)

27. Notwithstanding DCAA's advice, on August 15, 2018, the contracting officer informed IAP that its legal costs related to the Al Ghanem litigation were "not expressly unallowable," and if included in IAP's certified cost proposals, would be "subject to normal audit procedures for reasonableness and allocability" (JSF ¶ 25).

28. On October 22, 2018, DCMA informed IAP that its "position has changed based upon additional information received during a meeting with" IAP executives. The government further stated that "since the parties operated under the terms of Joint Venture Contract (the Contract) as if a Joint Venture had been formed, and no other formal agreement was signed between the parties, litigation costs associated with this Contract are expressly unallowable under . . . FAR 31.205-47(f)(5)(i)." (JSF ¶ 26; R4, tab 25 at 910) On November 9, 2018, the contracting officer concurred with DCMA's conclusions and also noted that any potential settlement costs were expressly unallowable (R4, tab 26). DCMA repeated its position in a subsequent letter on April 16, 2019, asserting the legal costs are expressly unallowable because they are "directly tied to" the termination of IAP's agreement with Mr. Al Ghanem (JSF ¶ 27).

---

[4] IAP and Mr. Al Ghanem were also involved in litigation in the U.S. District Court for the Southern District of New York. IAP's claims in these consolidated appeals do not include claims for legal costs arising from that litigation. (JSF ¶ 24 n.2)

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

*The Claims and Contracting Officer Final Decisions (COFDs)*

29. On November 19, 2019, IAP submitted a certified claim to the contracting officer for two related claims: (1) payment of $4,610,092 in legal defense costs IAP incurred in Fiscal Years (FYs) 2016-2019, and (2) "for contract interpretation finding that payments pursuant to IAP's potential settlement with Al Ghanem will be allowable" (JSF ¶ 28).[5] IAP attached a declaration of Mr. Terry DeRosa, former Chief Executive Officer of IAP Worldwide Services, Inc., dated November 19, 2019, to its claim. The declaration was made under penalty of perjury. (JSF ¶ 29) It primarily addresses IAP's selection of counsel and handling of the litigation (R4, tab 38 at 1467-71).

30. According to the claim, the costs for the litigation are reasonable, allocable to IAP's government contracts as G&A costs necessary to its overall operation, consistent with the Cost Accounting Standards (CAS), and not unallowable under its contracts or FAR subpart 31.2. IAP wanted these amounts included in its G&A for FYs 2016-2019. (R4, tab 32 at 942) IAP disputed that it formed a joint venture with Mr. Al Ghanem arguing it only adopted Kuwaiti nomenclature when titling the agreement "Joint Venture Contract" (*id.* at 943).

31. IAP argued the costs were reasonable because it had to defend itself in lengthy Kuwaiti and United States proceedings and conducted research before selecting counsel, ensuring it negotiated favorable terms with counsel and experts (R4, tab 32 at 946). IAP argued the costs were not unallowable pursuant to FAR 31.205-47(f), because the agreement with Mr. Al Ghanem was not a joint venture agreement or similar arrangement as there were no provisions for joint control or shared losses as required for a joint venture under U.S. law (*id.* at 948). IAP also argued that it never formed an entity to act on its behalf as the prime contractor as the agreement stated only IAP would be the contracting party (*id.* at 949).

32. IAP also argued the agreement does not evidence a teaming arrangement as no new entity was formed to act as a potential prime contract. According to IAP, there was no prime/subcontractor relationship formed either as Mr. Al Ghanem was hired to assist with multiple contracts and not on one particular government contract. Similarly, IAP argues the agreement does not evidence a "similar arrangement of shared interest," which it believes is a term that should be narrowly construed. (R4, tab 32 at 950)

33. Finally, IAP argued its costs incurred are allowable because, pursuant to

---

[5] Pursuant to a May 14, 2024 Order, based on the parties' joint stipulation, the second claim issue was dismissed. As such, we will not discuss the issue in detail in the decision.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

FAR 31.205-47(f), they were incurred as a result of the compliance with specific terms and conditions of the contract. Therefore, assuming arguendo the agreement was a joint venture agreement, this exception would apply. According to IAP, its government contracts required it comply with Kuwaiti law to perform the work and this required IAP operate through a local agent, in this case Mr. Al Ghanem. (R4, tab 32 at 951) Specifically, IAP's contracts included FAR 52.236-7, which required IAP obtain any necessary licenses and permits; and some included requirements to comply with local license and permit requirements, labor laws, taxes and immigration requirements, environmental rules, bond and insurance requirements, etc. (id. at 951-52). Further, IAP contended that Kuwaiti law required IAP engage a local agent to operate in Kuwait (R4, tab 32 at 952 quoting Article 23 of Kuwaiti Commercial Law (Law No. 15 of 1960, as amended by Law No. 68 of 1980)) (id. at 952).

34. The contracting officer issued a final decision on those claims on May 18, 2020 (the first COFD). The first COFD denied IAP's claim for legal defense costs as unallowable pursuant to FAR 31.205-47(f)(5)(i) because the costs were incurred in connection with litigation arising from an agreement or contract that constitutes a joint venture or similar arrangement of shared interest. The first COFD also found the costs unreasonable and therefore unallowable pursuant to FAR 31.201-3 and FAR 31.201-2, because "IAP's decision to enter into the JV Contract with Al Ghanem on unfavorable terms – and then to breach that contract – was not the conduct of a prudent business and does not reflect generally accepted sound business practices." (JSF ¶ 30)[6] On August 12, 2020, IAP filed a notice of appeal with the Board concerning this COFD, which we docketed as ASBCA No. 62638.

35. IAP's costs related to the Florida Litigation continued through FY 2023 (JSF ¶ 31). IAP submitted another certified claim on January 30, 2024, for payment of $8,408,395.82 in legal defense costs incurred in FYs 2020-23. This represents IAP's calculation of the allocation to IAP's cost-type contracts of IAP's total legal defense costs for the Kuwait and Florida Litigations in FYs 2020-23, which amounted to $12,357,732. (JSF ¶ 32) The claim included the same legal basis as the prior one for such costs (R4, tab 38 at 995-1006). IAP attached the same declaration of Mr. Terry DeRosa, former Chief Executive Officer of IAP Worldwide Services, Inc., dated November 19, 2019, and made under penalty of perjury, to its claim (JSF ¶ 33).

36. On March 12, 2024, the contracting officer issued a final decision (the second COFD) disallowing IAP's claim for payment for legal defense costs IAP

_____

[6] The first COFD also explained that IAP's request for a final decision regarding a potential settlement with Mr. Al Ghanem was not a valid claim because the costs had not been incurred and IAP had not presented a certified claim for a sum certain (JSF ¶ 30).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

incurred in FYs 2020-23 defending itself in the Kuwait and Florida litigation arising out of its agreement with Mr. Al Ghanem. The second COFD denied IAP's claim for legal defense costs as unallowable pursuant to FAR 31.205-47, and unreasonable and therefore unallowable pursuant to FAR 31.201-2 and FAR 31.201-3. (JSF ¶ 34)

37. Specifically, in the second COFD, the contracting officer noted that "[t]he JV Contract states that IAP and Al Ghanem intended to form a Joint Venture Company that would be jointly owned, and to share profits from IAP's contracts," and concluded that "IAP clearly did form an agreement with Al Ghanem to establish a separate company that was jointly owned and operated for their mutual benefit." The contracting officer concluded that IAP's legal costs are unallowable because "the JV Contract constitutes a joint venture under FAR 31.205-47(f)(5) or, alternatively, a similar arrangement of shared interest." The contracting officer also again concluded that the costs were unreasonable and therefore unallowable pursuant to FAR 31.201-2 and FAR 31.201-3, because "IAP's decision to enter into the JV Contract with Al Ghanem on unfavorable terms – and then to breach that contract – was not the conduct of a prudent business and does not reflect generally accepted sound business practices." (JSF ¶ 35)[7]

38. On April 18, 2024, IAP filed an appeal with the Board concerning the second COFD. The Board docketed the appeal as ASBCA No. 63879 and consolidated it with ASBCA No. 62638. *See* April 23, 2024 Notice of Docketing.

<u>DECISION</u>

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When considering cross-motions for summary judgment, we "evaluate each motion on its own merits, taking care in each instance to view the evidence in favor of the non-moving party." *Almanza v. United States*, 935 F.3d 1332, 1337 (Fed. Cir. 2019) (citing *Anderson*, 477 U.S. at 255). However, "[t]he Government has the burden of proof in establishing the unallowability (by operation of specific contract provision or regulation) of a cost." *Lockheed Martin Western Dev. Lab'ys*, ASBCA No. 51452, 02-1 BCA ¶ 31,803 at 157,102 (citations omitted).

The issues presented here are interpretation of the pertinent regulation (FAR 31.205-47(f)) and the JVC. Interpretation of a regulation is a question of law appropriate for resolution by summary judgment. *BAE Sys. Info.*, ASBCA No. 44832,

---

[7] The government did not seek penalties because IAP excluded the costs at issue here from its incurred costs submissions and has sought reimbursement via these claims and appeals (gov't mot. at 7 n.4).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

01-2 BCA ¶ 31,495 at 155,522 (citing *Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1137 (Fed. Cir. 1995); *Riverside Research Inst. v. United States*, 860 F.2d 420, 422 (Fed. Cir. 1988)). Likewise, contract interpretation is a question of law that is generally amenable to summary judgment. *Varilease Tech. Grp., Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002) (citations omitted).

<u>FAR 31.205-47(f), Joint Ventures, Teaming Arrangements and other Similar Arrangements</u>

FAR 31.204(a), explains that "[c]osts are allowable to the extent they are reasonable, allocable, and determined to be allowable under 31.201, 31.202, 31.203, and 31.205." FAR 31.205-47, Costs Related to Legal and Other Proceedings, explains that certain of these costs are either allowable or unallowable. Pertinent here, FAR 31.205-47(f), states that the following costs are "unallowable if incurred in connection with the following:

> (5) Costs of legal, accounting, and consultant services and directly associated costs incurred in connection with the defense or prosecution of lawsuits or appeals between contractors or subcontractors arising from either—
>
> (i) An agreement or contract concerning a teaming arrangement, a joint venture, or similar arrangement of shared interest; or
>
> (ii) Dual sourcing, coproduction, or similar programs, are unallowable, except when—
>
> (A) Incurred as a result of compliance with specific terms and conditions of the contract or subcontract or written instructions from the contracting officer; or
>
> (B) When agreed to in writing by the contracting officer.

FAR 31.001, defines an expressly unallowable cost as a "particular item or type of cost which, under the express provisions of an applicable law, regulation, or contract, is specifically named and stated to be unallowable." Accordingly, FAR 31.205-47(f)(5), sets forth specific costs that are expressly unallowable. *See Raytheon Co. v. Sec'y of Def.*, 940 F.3d 1310, 1313 (Fed. Cir. 2019).

Thus, the issue presented by the parties is whether IAP's legal costs are expressly unallowable pursuant to FAR 31.205-47(f)(5), and therefore IAP cannot

12

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

include them in its incurred cost proposals.[8]  Specifically, the parties have asked us to decide whether the litigation between IAP and Mr. Al Ghanem arises from "[a]n agreement or contract concerning a teaming arrangement, a joint venture, or similar arrangement of shared interest."  *See* FAR 31.205-47(f)(5)(i).

IAP argues the costs are allowable because its agreement with Mr. Al Ghanem is *not* a joint venture, teaming agreement or other similar arrangement.  IAP contends that, based on the legislative and regulatory history of this FAR subsection (which we discuss later), litigation costs concerning joint ventures and similar arrangements are unallowable because these types of business dealings between government contractors are made to improve each contractor's competitive position with no benefit to the government (i.e., the sole benefit is to the contractors) (app. mot. at 5-6 citing to *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030 (9th Cir. 1983)).  IAP argues, as one would expect, that this case is different.  According to IAP, its agreement with Mr. Al Ghanem did not involve a "true joint venture;" rather, it is merely a U.S. contractor engaging a local vendor to comply with host nation laws in support of a contract and U.S. military operations abroad (app. mot. at 7).

DCMA counters IAP's arguments regarding the history of this regulation, noting there is nothing indicating it is limited to certain types of joint ventures.  In fact, DCMA avers the regulation is broadly written as it includes the all-encompassing clause "or similar arrangement of shared interest."  (Gov't reply at 11-12)

IAP also argues the agreement did not create a joint venture because it did not provide for joint control or joint right of control over a formed entity (app. mot. at 8-9, citing *Aries Marine Corp.*, ASBCA No. 37826, 90-1 BCA ¶ 22,484; *Cooper-Macdonald, Inc. v. United States*, 559 F.2d 575, 588 (1977); app. reply at 9).  According to IAP, as the parties never formed a separate legal entity, there could be no joint right of control (app. mot. at 9 quoting Defense Contract Audit Agency, Selected Area of Cost Guidebook:  FAR 31.205, Cost Principles (DCAA Guidebook) at 37-1 (2014); *see also* app. reply at 7).  In response, DCMA highlights that the relevant FAR subsection provides that litigation costs arising from an agreement "concerning" a joint venture (or other arrangement of shared interest) are unallowable (gov't mot. at 19-20 quoting FAR 31.205-47(f)(5)(i)).  Thus, DCMA contends the litigation arises from an agreement concerning the joint venture, whether or not one was formally established (gov't mot. at 19-20).

---

[8] Neither party argues that the costs may have been unallowable, but not expressly so.  In the circumstances here, where we ultimately find that the FAR included a positive proscription against the costs incurred, we need not address whether the costs are merely unallowable.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

IAP further contends that there was also no joint control, or meaningful control, because IAP was vested with sole management responsibility and Mr. Al Ghanem, in comparison, only provided local support (app. reply at 8-9). As support, IAP argues that all government contracts were in IAP's name and the government paid all contract money to only IAP (app. mot. at 9). DCMA argues that the agreement expressly provides for joint control as each party was responsible for and controlled certain aspects of the joint venture (gov't mot. at 18-19). In this regard, DCMA contends that as Mr. Al Ghanem had to secure visas and right to work documents, he must have dealt with Kuwaiti authorities on behalf of the joint venture, which evidences joint control (gov't reply at 7-8).

In addition, IAP argues the agreement here is not a joint venture agreement because while it may have allowed for profit sharing, it did not include any provisions for the sharing of losses, which is an essential element of a "joint" venture (app. mot. at 10-11; app. reply at 7). DCMA argues there is no requirement that joint venture parties share in any losses and even if there was one, Mr. Al Ghanem had to advance some costs and his time, which he would have lost had the joint venture not been profitable (gov't mot. at 17-18; gov't reply at 7). DCMA relies on the holding from the Florida court, which noted Mr. Al Ghanem "purportedly" provided the joint venture with funds and credits, among other things (gov't reply at 7 quoting ex. A at 4).

DCMA primarily contends the agreement here is a joint venture pursuant to U.S. law because: (1) the name of the agreement is "Joint Venture Contract;" (2) the parties combined their efforts (IAP's expertise in government contracts and Mr. Al Ghanem's expertise in local laws) to undertake the business venture of supporting the U.S. Army and others in Kuwait and Iraq; and (3) both parties pooled their resources and advanced money to support the business and then shared in the profit (gov't mot. at 15-17). DCMA contends it does not matter the contracts were all in IAP's name because IAP was supposed to credit the joint venture with the profits (*id.* at 17).

DCMA also argues that as the joint venture was governed by Kuwaiti law, and the Kuwaiti courts found the parties formed a joint venture, this Board must give preclusive effect to that foreign judgment (gov't mot. at 21-22, 24-25; gov't reply at 17-18). IAP argues that Kuwaiti law was to only govern disputes between the parties, not a dispute regarding the cost principles of the FAR (app. reply at 12). Similarly, IAP argues there is no issue preclusion because the issues litigated in the Kuwaiti courts are not the same issues litigated here; namely, the Kuwaiti court litigated whether the parties formed a joint venture under Kuwaiti law and not whether a joint venture existed for purposes of FAR 31.205-47(f)(5) (*id.* at 11-12).

14

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

For similar reasons, IAP contends the agreement was not a teaming arrangement or other similar arrangement of shared interest (app. mot. at 12-13; app. reply at 15-17). IAP argues that it never combined resources or bid on government contracts together (app. mot. at 13; app. reply at 16). DCMA argues that IAP and Mr. Al Ghanem are two private contractors that pooled their resources to work on a project, which neither would have been able to undertake on their own (gov't mot. at 27; gov't reply at 14).

Finally, IAP argues that even if the Board deemed the parties to have formed a separate legal entity, the agreement stated IAP was entirely responsible for the company's management and Mr. Al Ghanem only provided local administrative legal and logistics support (app. mot. at 9). At most, IAP contends its relationship with Mr. Al Ghanem was more akin to a subcontractor and legal costs for allowing a claim by a subcontractor (*id.* at 10 (citations omitted)).

When interpreting a regulation, statute, or contract, we read it as a whole and generally give its words their normal or usual meanings. *Gulf Pac. Contracting, LLC*, ASBCA No. 61434, 21-1 BCA ¶ 37,928 at 184,206 (citing *Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339, 1346 (Fed. Cir. 2005); *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227-28 (Fed. Cir. 1997) (plain language and "ordinary meaning")). As both parties note, the FAR does not include a definition of joint venture. We have therefore looked to other sources for guidance as to its normal or usual meaning.

Both parties reference the DCAA Guidebook, which expands upon the Contract Audit Manual to address specific areas of FAR 31.2 cost principles. *See* https://www.dcaa.mil/Guidance/Selected-Area-of-Cost-Guidebook/ (last visited January 28, 2026). At the onset, we note the guidebook is not binding on us, and is certainly not dispositive to our decision today. Nevertheless, we address it here because it is raised by both parties and demonstrates that our conclusion is generally consistent with agency practice. Chapter 41 of the guidebook generally iterates the FAR with respect to the allowability of litigation costs involving a joint venture, teaming arrangement or other similar agreement. DCAA Guidebook at 41-4. Chapter 37, however, specifically addresses types of joint ventures and teaming arrangements. It explains that as the FAR does not address joint ventures as a party to a procurement under a Government contract, "[i]t is therefore necessary to understand the purpose for and characteristics of a joint venture when reviewing the venture in terms of the FAR, specifically the FAR cost principles on allowable costs." *Id.* at 37-8. Thus, we understand this chapter relates more to how the cost principles apply to a joint venture awarded and performing a contract, but find it nonetheless useful here.

As pertinent, Chapter 37 of the Guidebook states that joint ventures are "owned and operated by two or more businesses or individuals as a separate entity (not a

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

subsidiary) for the mutual benefit of the members of the group." DCAA Guidebook at 37-2. However, the guidebook also recognizes unincorporated joint ventures, which can be partnerships or teaming arrangements between two or more corporations and have: (1) few or no employees; (2) little or no assets or separate facilities; (3) no separate financial statements; and (4) little or no G&A, or material handling expenses. *Id.* Further, the guidebook explains that each joint venture investor participates either directly or indirectly in the overall management (i.e., acts as more than just passive investors) and one investor does not have majority voting interest. *Id.* "Joint ventures possess the characteristics of joint control" which is defined as "joint property, joint liability for losses and expenses, and joint participation in profits." *Id.* at 37-2, 37-12. Notably, the guidebook also defines a partnership as "two or more entities (persons) [that] combine capital and/or services to carry on a business for profit" and is considered "a group of separate persons rather than as a single entity." *Id.* at 37-3.

There is also case law discussing joint ventures and the Board itself has previously, in a different context, defined a joint venture. In *Worleyparsons Int'l, Inc.*, we stated that "[a] joint venture is an association of partners established by contract to carry out a single business activity for joint profit. It is essentially a partnership created for a limited purpose." *Worleyparsons Int'l, Inc.*, ASBCA No. 57930, 14-1 BCA ¶ 35,482 at 173,959 (citing *Sadelmi Joint Venture v. Dalton*, 5 F.3d 510, 513 (Fed. Cir. 1993)). Generally, each member of the joint venture can act for and bind the enterprise, unless the agreement states otherwise, and the "[j]oint venturers may allocate the tasks of the venture." *Sadelmi Joint Venture*, 5 F.3d at 513.

"Typically, a joint venture has an independent existence from its partners." *Worleyparsons Int'l, Inc.*, 14-1 BCA ¶ 35,482 at 173,959 (citing *Pine Prods. Corp. v. United States*, 945 F.2d 1555, 1560 (Fed. Cir. 1991)). Such agreements, therefore, are "governed by the law applicable to partnerships, rather than corporations." *Edward Hayes, As Liquidator of Base Operation Servs. GmbH*, ASBCA Nos. 59829, 59907, 17-1 BCA ¶ 36,677 at 178,597 (citing *Pine Prods. Corp.*, 945 F.2d at 1560 (holding that general principles of partnership law are applicable to joint ventures); *see also American Export Grp. Int'l Servs., Inc./Zublin Delaware, Inc., A Joint Venture*, ASBCA No. 42616, 93-1 BCA ¶ 25,373 at 126,364 (holding that nature of a joint venture is similar to a traditional partnership).

Now that we have a framework of a joint venture, we next review the agreement at issue here. "Contract interpretation begins with the language of the written agreement." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004); *see also C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993) ("A contract is read in accordance with its express terms and the plain meaning thereof"). The plain language of the agreement between IAP and Mr. Al Ghanem evidences it was a joint venture agreement.

16

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

The agreement created a separate entity, a partnership, with an independent existence from its venturers (not a subsidiary) that was owned and operated by two or more businesses/individuals for the mutual benefit of the members (SOF ¶¶ 2-5). Although there may have been an intent at one point for the parties to form an actual limited liability company (SOF ¶¶ 12, 21-22), the failure to do so does not negate the existence of the partnership. The entity created was governed by the agreement, aptly titled "Joint Venture Contract" (SOF ¶ 2).

In addition, the joint venture's purpose was to carry out a single business activity for joint profit: performance of contracts in Kuwait (SOF ¶¶ 2-3, 7, 9). As such, both IAP and Mr. Al Ghanem participated either directly or indirectly in the overall management and were more than just passive investors. Specifically, the JVC outlined the roles of each--IAP to contract with the U.S. government, and Mr. Al Ghanem to provide local support (SOF ¶¶ 2-3, 17).

Further, both parties shared in the profits and were to be reimbursed for operational expenses and advanced monies (SOF ¶¶ 5, 9-10). In fact, Mr. Al Ghanem was compensated for his duties (SOF ¶ 24). And although the awarded government contracts would be in IAP's name, this did not jeopardize Mr. Al Ghanem from receiving profits from those contracts (SOF ¶ 4). While IAP was the managing venturer and received a management fee, the agreement also stated that any joint venture account would be controlled by both parties and required all amendments and modifications to be in writing and signed by both parties (SOF ¶¶ 5, 8-10, 12, 17-18). This evidences joint control.

We note that this conclusion is consistent with the Kuwait courts' rulings; we also note that Kuwaiti law governed any disputes relating to the agreement (SOF ¶ 6). As discussed, the Kuwait courts explained that a joint venture is a commercial partnership, no corporate body is required, but the partners still have recourse against each other based upon the terms and conditions of the "joint venture partnership agreement" (SOF ¶¶ 22-23).

With respect to IAP's argument that the agreement lacks a statement on the sharing of losses, we similarly conclude that upon review of both U.S. and Kuwaiti law, the answer is the same. The general rule is that the right to share profits and losses is an essential element of a joint venture. 48A C.J.S. Joint Ventures § 14. However, while some courts require the agreement expressly include a loss-sharing provision, "it is more commonly held that there need be no specific agreement to share in the losses since an agreement to share losses may be implied from an agreement to share profits." *Id.* In addition, a loss does not have to be monetary but can include "time expenditures and out-of-pocket expenses, especially where one party to the venture furnishes property, and the other only services." *Id.*; *see also* 46 Am. Jur. 2d Joint Ventures § 16 (joint venture may exist "where the agreement requires the

17

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

expenditure of time, effort, and expense by the parties such that the parties would share in the loss caused by unsuccessful efforts under the agreement").

Further, if there is no loss-sharing provision, courts may allocate the losses in the same ratio as the profit sharing provision or the division of ownership. 46 Am. Jur. 2d Joint Ventures § 24. This is consistent with the Restatement of the Law-Contracts, which explains that when an essential term is omitted, "a term which is reasonable in the circumstances is supplied by the court." RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981). Accordingly, if there is other evidence a joint venture exists, "it is not essential that the parties agree, expressly or implicitly, to share the losses." 48A C.J.S. Joint Ventures § 14. There is much evidence a joint venture exists here. Likewise, per Kuwaiti law, if the agreement did not explain how losses would be shared, the parties would share in losses with the same percentage set forth for profit-sharing (SOF ¶ 23). Thus, the agreement here is still one for a joint venture, despite the fact it lacks a specific statement on the sharing of losses.

We also note that even if this were not considered a joint venture, we would apply the principle of *noscitur a sociis* and conclude this was a "similar arrangement of shared interest." According to this principle, "a word is known by the company it keeps," so as to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words." *Schlumberger Tech. Corp v. United States*, 845 F.3d 1158, 1165 (Fed. Cir. 2017) (quoting *Yates v. United States*, 574 U.S. 528, 543 (2015)). Here, the pertinent FAR subsection states that litigation costs are unallowable when arising from an agreement/contract "concerning a teaming arrangement, a joint venture, or similar arrangement of shared interest." FAR 31.205-47(f)(5)(i).

A teaming arrangement is defined in a different section--FAR 9.601. Per that definition, a contractor team arrangement is either when companies form a partnership or joint venture to act as a potential prime contractor, or a potential prime contractor agrees with other companies to have them act as its subcontractors under a government contract or acquisition program. FAR 9.601. Such arrangements may be useful from a government or industry standpoint when the companies complement each other's unique capabilities and provide the best combination of performance, cost and delivery for the item acquired. FAR 9.602(a). In sum, a teaming arrangement is a partnership or joint venture created by companies with a shared interest in a government contract or program, where the companies' capabilities complement each other.

Accordingly, a joint venture and teaming arrangement are a partnership of companies with capabilities that complement each other for the purpose of a shared interest (i.e., the government contract or program). Knowing there are other types of entities that can be formed, such as a partnership, FAR 31.205-47(f)(5) includes the catchall "a similar arrangement of shared interest." In other words, even if one were to conclude the agreement here did not culminate in a joint venture, it was a similar

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

arrangement (partnership) of shared interest; the interest being providing supplies, support and services for the U.S. Army or others in Kuwait and Iraq performed in Kuwait in return for remuneration which the parties would divide according to the terms set forth in the agreement (*see* SOF ¶¶ 3, 11).

### FAR 31.205-47(f) – The Exception to the Rule

As noted, the FAR provides these costs may nonetheless still be allowable if they are incurred when complying with specific terms and conditions of the contract or subcontract. FAR 31.205-47(f)(5)(ii)(A). IAP argues that even if the agreement is considered a joint venture agreement, these litigation costs are still allowable because IAP incurred them as a direct result of its compliance with contract and host nation requirements (app. mot. at 13; app. reply at 17-18).

Specifically, IAP contends its contracts required compliance with local Kuwaiti laws (app. mot. at 14; app. reply at 18; SOF ¶¶ 14-15). IAP cites to FAR 52.236-7, Permits and Responsibilities, which required IAP obtain necessary licenses and permits to conduct business and comply with local laws, and another contract with a requirement for the leasing and rental of heavy lift equipment in compliance with contract and local laws and regulations (app. mot. at 14; SOF ¶¶ 14-15). IAP contends the Kuwaiti law, during the requisite timeframe, stated:

> No person other than a Kuwaiti may carry on a trade in Kuwait, unless he/she has one or more Kuwaiti partners, provided that the capital invested by the Kuwaitis in the commercial establishment is not less than 51 percent of its total capital.

(App. mot. at 14 quoting Article 23 of Kuwaiti Commercial Law (Law No. 15 of 1960, as amended by Law No. 68 of 1980)) IAP contends this required IAP either invest as a minority shareholder in a Kuwaiti company or appoint a Kuwaiti agent to conduct the business under its own license on behalf of the foreign principle (app. mot. at 14-15) (citation omitted).

DCMA argues that IAP was not required to enter into a joint venture agreement to perform the contracts so this exception does not apply (gov't mot. at 32; gov't reply at 16). DCMA highlights that IAP's agreement with Mr. Khoursheed was not a joint venture agreement, and was a service agency agreement where Mr. Khoursheed was an independent contractor providing the needed local services (gov't mot. at 32; SOF ¶¶ 18-19). According to IAP, the government's argument that it could have entered into a different type of agreement with Mr. Al Ghanem misses the point; the point is it entered into the agreement to comply with the terms of the government contract (app. mot. at 15-16).

19

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

DCMA also argues that FAR 52.236-7, which requires the government contractor obtain necessary licenses and permits shall do so "without additional expense to the Government" and the government is not responsible for "damages to persons or property that occur as a result of the Contractor's fault or negligence" (gov't mot. at 31). IAP argues this clause does not address litigation expenses in defending lawsuits bought by a local sponsor or make them expressly unallowable (app. reply at 19).

While there are no cases on point addressing the exception in FAR 31.205-47(f), there are cases discussing the exact same language set forth in other FAR sections or agency clauses and, applying the presumption of consistent usage, *see GEMS En't. Mgmt. Servs.*, ASBCA Nos. 61737 *et al.*, 24-1 BCA ¶ 38,621 at 187,744, to the FAR, we find the meaning of this language elsewhere in the regulation to be helpful to our interpretation of it here. As shown below, this subsection is constructed narrowly.

For example, FAR 31.205-15(a) states that fines and penalties from failure to comply with laws and regulations are unallowable "except when incurred as a result of compliance with specific terms and conditions of the contract or written instructions from the contracting officer." In *Alfair Dev. Co., Inc.*, the Board ruled that fines for a traffic violation were not allowable pursuant to FAR 31.205-15(a) because there was no evidence the truck overload violation was the result of compliance with specific terms and conditions of the contract or pursuant to instructions from the contracting officer. *Alfair Dev. Co., Inc.*, ASBCA Nos. 53119, 53120, 05-2 BCA ¶ 32,990 at 163,517.

In *Abraham v. Rockwell Int'l Corp.*, the appellant sought to recover as allowable certain attorneys' fees and costs incurred in defending itself and its employees against possible criminal environmental charges. *Abraham v. Rockwell Int'l Corp.*, 326 F.3d 1242, 1245 (Fed. Cir. 2003). The appellant's contract included a Department of Energy clause stating that fines and penalties resulting from contractor violations of laws or regulations were unallowable "except when incurred in accordance with the written approval of the Contracting Officer or *as a result of compliance with the provisions of this contract*." *Id.* at 1251 (citation omitted).

Although the Federal Circuit did not rely on this clause in reaching its ultimate decision, its discussion is nonetheless useful here. For example, the court stated "[i]t is questionable whether this clause should be construed to authorize the reimbursement of all fines and penalties attributable to work within the scope of the contracts" because the strong public policy is to bar the recovery of criminal fines and penalties. *Abraham*, 326 F.3d at 1251. The court reviewed the statutory language pertaining to this Department of Energy clause, which is virtually the same as the Department of Defense statutory language regarding the same, as implemented in FAR 31.205-15(a).

20

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

The court explained the language did "not provide for a broad 'scope of work' exception, but rather narrowly refers to" compliance with the specific contract terms and conditions. *Id.* (quoting Pub. L. No. 99-145, 99 Stat. 583, 774). The court further explained:

> This suggests that the provision is applicable only to fines and penalties that resulted from particular work directly required by the contract. For example, if the contract ordered that a particular area be filled, a fine incurred for doing that very act in the manner required by the contract would be recoverable. If, however, the work could have reasonably been performed so as to avoid the levied fines or penalties, there would be no reimbursement under the exception to the general non-allowability language of the Fines and Penalties Clause. A broader "scope of work" interpretation would appear to render virtually all fines and penalties allowable.

*Abraham*, 326 F.3d at 1251-52; *see also Security Assocs. Int'l, Inc.*, DOTCAB Nos. 1340, 1432, 84-2 BCA ¶ 17,444 (holding that the contract contained no requirement to ignore law requiring pay wages to employees in Puerto Rico when interpreting the same provision under the Federal Procurement Regulations).

Based on all of this, we agree the "exception" in FAR 31.205-47(f)(5), that litigation costs be treated as allowable if a result of compliance with specific terms and conditions of the contract, should not be construed broadly. Thus, we conclude there is no clause or requirement in the contracts here that expressly provide these litigation costs relating to the JVC should be allowable. The clauses IAP relies on, the Host Nations clause and FAR 52.236-7, required IAP obtain necessary licenses and permits and comply with host nation laws (SOF ¶¶ 14-15), but did not explain how IAP should do this or require IAP enter into this JVC. More important, these clauses do not expressly state that litigation (or other) costs arising from IAP's compliance with host nation laws (e.g., to work with a Kuwaiti national in performing the contract) should be considered allowable. In fact, the FAR 52.236-7 clause appears to state the opposite. *See* SOF ¶ 14 (FAR 52.236-7 states IAP shall comply with local laws "without additional expense to the Government").

We note that IAP discusses the history of this regulation (albeit as it relates to the definition of joint venture), but we address the history here as it seems more pertinent to this argument. Further, although we do not need to look beyond the language of the FAR because the regulation is clear, we find the regulatory history of the subsection also supports our interpretation. *See Parsons Gov't Servs., Inc.*, ASBCA No. 62269 *et al.*, 25-1 BCA ¶ 38,800 at 188,718 (citing *Lockheed Corp.*, 113

21

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

F.3d at 1227 (examining regulatory history of provision at issue even where its plain language was clear as to its meaning); *Exelis, Inc.*, ASBCA No. 58966, 17-1 BCA ¶ 36,708 at 178,748 (same)).

Initially, the FAR did not include this paragraph regarding litigation costs and joint ventures, etc. Rather, the FAR originally stated that costs of professional and consultant services were allowable when reasonable. Establishing the Federal Acquisition Regulation, 48 Fed. Reg. 42102, 42322 (Sept. 19, 1983) (to be codified at 48 C.F.R. ch. 1) (citing FAR 31.205-33(a)). There were exceptions to the rule: legal, accounting and consulting services incurred relating to organization/reorganization, defense of antitrust suits, prosecution of claims against the government, and most patent infringement cases were not allowable. *Id.* (citing FAR 31.205-33(d)).

In 1985, Congress enacted 10 U.S.C. § 2324, as part of the Defense Procurement Improvement Act of 1985, Pub. L. 99-145, Sec. 911(a), requiring new FAR rules to clarify certain cost principles. One such principle requiring clarification was "Professional and consulting services, including legal services." 10 U.S.C. § 2324(f)(1)(H). As a result, the FAR councils issued a proposed rule which added, among other things, paragraph (f) to FAR 31.205-33, stating the following:

> Costs of legal, accounting, and consultant services and directly associated costs incurred in connection with the defense or prosecution of lawsuits or appeals between two contractors arising from either: (1) An agreement or contract concerning a teaming arrangement, a joint venture, or similar arrangement of shared interest in a Government contract; or (2) dual sourcing, co-production, or similar programs, are unallowable.

Federal Acquisition Regulation (FAR); Costs of Litigating Appeals Against the Government, 50 Fed. Reg. 51,778 (Dec. 19, 1985). The rule also proposed as unallowable legal costs incurred in defense against government claims or appeals and prosecution of appeals against the government. *Id.* According to the preamble of the proposed rule, this revision added to the list of unallowable legal, account and consulting costs and was necessary "because of problems encountered in administering this cost principle and [were] not a change in policy," as these costs were already being disallowed, but disputed by some contractors. *Id.* The FAR issued a final rule, with some changes from the proposed; specifically, the rule added the "exception" that such incurred costs would be allowable if a result of compliance with specific terms and conditions of the contract, written instructions from the contracting officer, or when the contracting officer agrees in writing. Federal Acquisition Regulation, 51 Fed. Reg. 12296, 12301 (Apr. 9, 1986) (to be codified at 48 C.F.R. pt. 31). This

22

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

paragraph was later moved to current FAR 31.205-47. Federal Acquisition Regulation (FAR); Miscellaneous Amendments, 54 Fed. Reg. 13,022 (Mar. 29, 1989) (to be codified at 48 C.F.R. pt. 31).[9]

According to IAP, this cost principle was the result of litigation involving a Northrop and McDonnell Douglas teaming arrangement (app. mot. at 5 citing to *Northrop Corp. v. McDonnell Douglas Corp.*, *supra*). IAP contends that Northrop and McDonnell Douglas had created a teaming arrangement to pool resources to develop aircraft variants that would become the F-18A (app. mot. at 5). The arrangement fell apart, resulting in litigation (*id.* at 5-6). McDonnell Douglas allegedly submitted the litigation costs for reimbursement as indirect costs of doing business and the Navy refused to allow them because such litigation "provides absolutely no benefit to the Navy's F-A-18 program" (app. mot. at 6 quoting *Firm Seeks to Recover $24 Million It Spent on Northrop Court Fight: U.S. Asked to Pay McDonnell Bills*, L.A. Times (March 20, 1985), https://www.latimes.com/archives/la-xpm-1985-03-20-fi-22830-story.html). IAP contends that against this backdrop, the FAR Council issued the proposed and then final rule amending the cost principle to specifically disallow such costs (app. mot. at 6-7).

In a decision involving this litigation, the court noted that the government had "urged them to 'team.'" *Northrop Corp.*, 705 F.2d at 1037. Pursuant to the arrangement, Northrop would submit proposals for Air Force competitions and McDonnell Douglas for Navy ones. *Id.* When McDonnell Douglas won the award for the F-18A fighter, Northrop served as a subcontractor. *Id.* at 1038. While Northrop's complaint included many claims, the court noted it did "not challenge the wisdom or legality of any governmental act or decision" but instead sought "to restrain and recover damages from McDonnell for the latter's allegedly improper tactics in marketing F-18's." *Id.* at 1047. The court explained this "challenged activity by McDonnell was neither authorized nor directed by any branch of Government" and the fact this conduct "occurred in a regulated industry does not alone alter its private commercial character." *Id.*

Therefore, even assuming IAP's legislative history argument is true, it does not help its case. Rather, this evidences that the rule did not intend for the government to cover private litigation costs amongst joint venturers or partners, and if it did, there must be specific authorization by the government (either in the contract or by the contracting officer) for these costs to be allowable. Although the purpose of IAP's joint venture agreement here was to assist with certain government contracts, the litigation amongst the joint venturers concerns an agreement not specifically

---

[9] The FAR added the term "or subcontractors" in 2023. Contract Cost Principles and Procedures, 88 Fed. Reg. 69517, 69522 (Oct. 5, 2023) (to be codified at 48 C.F.R. pt. 31).

23

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

authorized or directed by the government under the terms and conditions of the contract.

## CONCLUSION

For the foregoing reasons, we grant DCMA's motion for summary judgment that the costs at issue here are expressly unallowable. IAP's appeal is denied.

Dated: May 6, 2026

LAURA EYESTER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62638, 63879, Appeals of IAP Worldwide Services, Inc., rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals